**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

MUSCOGEE (CREEK) NATION,
a federally recognized Indian Tribe,

*Plaintiff*,

v.

CITY OF TULSA; G.T. BYNUM, in his official capacity as Mayor of City of Tulsa; WENDELL FRANKLIN, in his official capacity as Chief of Police, Tulsa Police Department; and JACK BLAIR, in his official capacity as City Attorney for City of Tulsa,

*Defendants*.

Case No. 23-cv-00490-SH

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**
**AND OPENING BRIEF IN SUPPORT**

**TABLE OF CONTENTS**


INTRODUCTION ....1

BACKGROUND ....2

I. Allocation of Criminal Jurisdiction on the Creek Reservation ....2

II. Tulsa's Continued Claims to Criminal Jurisdiction over Indians Within the Creek Reservation After *McGirt* ....3

III. The Tenth Circuit's Decision in *Hooper v. City of Tulsa* ....4

IV. Tulsa's Continued Claim to Criminal Jurisdiction over Indians Within the Creek Reservation After *Hooper* ....4

ARGUMENT ....6

I. The Nation Has Standing To Bring This Action. ....6

II. The Nation Amply Satisfies the Four-Factor Preliminary Injunction Test. ....6

A. Preliminary Injunction Standard ....6

B. The Nation Is Likely To Succeed on the Merits. ....7

1. The Nation Has a Substantial Likelihood of Success on Tulsa's Curtis Act Claim. ....7

2. The Nation Has a Substantial Likelihood of Success on the Merits of Tulsa's Claim to Jurisdiction Under *Castro-Huerta*. ....8

a. *Castro-Huerta* Does Not Disturb the Longstanding Rule that States Lack Criminal Jurisdiction over Indians in Indian Country Absent Congressional Assent. ....8

b. States Retain No Criminal Jurisdiction over Indians Under the Tenth Amendment. ....12

c. Opposite Presumptions Govern Authority over Indians and Non-Indians in Indian Country. ....15

d. Congress Has Acted Repeatedly on the Understanding that States Presumptively Lack Criminal Jurisdiction over Indians in Indian Country. ....17

C. The Nation Will Suffer Irreparable Harm in the Absence of a Preliminary Injunction. ....21

D. The Balance of Harms and the Public Interest Strongly Favor Issuance of an Injunction. ....23

CONCLUSION....25

# TABLE OF AUTHORITIES

## Cases

*Agostini v. Felton*,
521 U.S. 203 (1997) ........ 11

*Baker v. USD 229 Blue Valley*,
979 F.3d 866 (10th Cir. 2020) ........ 6

*Bosse v. Oklahoma*,
580 U.S. 1 (2016) ........ 11

*Boulter v. Noble Energy Inc.*,
74 F.4th 1285 (10th Cir. 2023) ........ 7

*Bryan v. Itasca County*,
426 U.S. 373 (1976) ........ 21

*Cheyenne-Arapaho Tribes of Oklahoma v. Oklahoma*,
618 F.2d 665 (10th Cir. 1980) ........ 9

*City of Elk City v. Taylor*,
157 P.3d 1152 (Okla. Crim. App. 2007) ........ 3

*City of Tulsa v. O'Brien*,
Case Nos. 720766–720766D (Mun. Criminal Ct. of Tulsa Aug. 11, 2023) ........ 5, 10

*Dear v. Nair*,
No. 21-2124, 2022 WL 2165927 (10th Cir. June 16, 2022) ........ 8

*Denver Homeless Out Loud v. Denver*,
32 F.4th 1259 (10th Cir. 2022) ........ 6

*Duro v. Reina*,
495 U.S. 676 (1990) ........ 9

*Ex parte Crow Dog*,
109 U.S. 556 (1883) ........ 8

*Fisher v. District Court of Sixteenth Judicial District of Montana*,
424 U.S. 382 (1976) ........ 23

*Garcia v. San Antonio Metropolitan Transit Authority*,
469 U.S. 528 (1985) .......... 14

*Haaland v. Brackeen*,
599 U.S. 255 (2023) .......... 13

*Hagen v. Utah*,
510 U.S. 399 (1994) .......... 9

*Hooper v. City of Tulsa*,
71 F.4th 1270 (10th Cir. 2023) .......... passim

*James Clark Distilling Company v. Western Maryland Railway Company*,
242 U.S. 311 (1917) .......... 16

*Kansas v. Garcia*,
140 S. Ct. 791 (2020) .......... 15

*Kennerly v. District Court of Ninth Judicial District of Montana*,
400 U.S. 423 (1971) .......... 17, 18

*Little v. Budd Company, Inc.*,
955 F.3d 816 (10th Cir. 2020) .......... 11

*MacArthur v. San Juan County*,
497 F.3d 1057 (10th Cir. 2007) .......... 15

*Mallory v. Norfolk Southern Railway Company*,
600 U.S. 122 (2023) .......... 11

*Maricopa County v. Valley National Bank of Phoenix*,
318 U.S. 357 (1943) .......... 14

*McClanahan v. State Tax Commission*,
411 U.S. 164 (1973) .......... 19

*McGirt v. Oklahoma*,
140 S. Ct. 2452 (2020) .......... passim

*Michigan v. Bay Mills Indian Community*,
572 U.S. 782 (2014) .......... 15

*Negonsott v. Samuels*,
507 U.S. 99 (1993) .......... 17

*Oklahoma v. Castro-Huerta*,
142 S. Ct. 2486 (2022) .......... passim

*Park Lake Resources Limited Liability Company v. U.S. Department of Agriculture*,
378 F.3d 1132 (10th Cir. 2004) .......... 7

*Parker Drilling Management Services, Ltd. v. Newton*,
139 S. Ct. 1881 (2019) .......... 19

*Pollard v. Hagan*,
44 U.S. 212 (1845) .......... 15

*Prairie Band of Potawatomi Indians v. Pierce*,
253 F.3d 1234 (10th Cir. 2001) .......... 6, 22

*Prudential Insurance Company v. Benjamin*,
328 U.S. 408 (1946) .......... 16

*Puerto Rico v. Sanchez Valle*,
579 U.S. 59 (2016) .......... 8

*Puerto Rico Department of Consumer Affairs v. Isla Petroleum Corp.*,
485 U.S. 495 (1988) .......... 15

*Rodriguez de Quijas v. Shearson/American Express, Inc.*,
490 U.S. 477 (1989) .......... 11

*Ross v. Neff*,
905 F.2d 1349 (10th Cir. 1990) .......... 9

*Seminole Tribe of Florida v. Florida*,
517 U.S. 44 (1996) .......... 13

*Skiriotes v. Florida*,
313 U.S. 69 (1941) .......... 13

*Strain v. Regalado*,
977 F.3d 984 (10th Cir. 2020) .......... 11

*Sturges v. Crowninshield*,
17 U.S. (4 Wheat.) 122 (1819) .......... 14, 15

*Three Affiliated Tribes of Fort Berthold Reservation v. Wold Engineering*,
476 U.S. 877 (1986) ........................................ 18, 19, 22

*Thurston Motor Lines, Inc. v. Jordan K. Rand, Ltd.*,
460 U.S. 533 (1983) ........................................ 11

*Toch, LLC v. City of Tulsa*,
474 P.3d 859 (Okla. 2020) ........................................ 8

*Torres v. Texas Department of Public Safety*,
142 S. Ct. 2455 (2022) ........................................ 14

*United States v. Comstock*,
560 U.S. 126 (2010) ........................................ 14

*United States v. Lara*,
541 U.S. 193 (2004) ........................................ 13, 15, 16

*United States v. Maloid*,
71 F.4th 795 (10th Cir. 2023) ........................................ 11

*United States v. McBratney*,
104 U.S. 621 (1881) ........................................ 13

*United States v. Pink*,
315 U.S. 203 (1942) ........................................ 14

*United States v. Sands*,
968 F.2d 1058 (10th Cir. 1992) ........................................ 9

*United States v. Spedalieri*,
910 F.2d 707 (10th Cir. 1990) ........................................ 7

*United States v. Wheeler*,
435 U.S. 313 (1978) ........................................ 15

*United States v. Williams*,
Case No. 23-CR-00230-GKF, 2023 WL 6221770 (N.D. Okla. Sept. 25, 2023) ........................................ 7

*Ute Indian Tribe of the Uintah and Ouray Reservation v. Lawrence*,
22 F.4th 892 (10th Cir. 2022) ........................................ 14

*Ute Indian Tribe of the Uintah and Ouray Reservation v. Utah*,
790 F.3d 1000 (10th Cir. 2015) .......... passim

*Washington v. Confederated Bands and Tribes of Yakima Indian Nation*,
439 U.S. 463 (1979) .......... 17, 18

*Williams v. Lee*,
358 U.S. 217 (1959) .......... 9, 16

*Winter v. Natural Resources Defense Council, Inc.*,
555 U.S. 7 (2008) .......... 6

*Wyandotte Nation v. Sebelius*,
443 F.3d 1247 (10th Cir. 2006) .......... 21, 22

**Constitutional Provisions and Statutes**

18 U.S.C. § 1151(a) .......... 2

18 U.S.C. § 3243 .......... 17

25 U.S.C. § 1301(2) .......... 10

Act of June 28, 1898, ch. 517, § 14, 30 Stat. 495 .......... passim

Act of May 31, 1948, ch. 279, 60 Stat. 229 .......... 17

Act of June 30, 1948, ch. 759, 62 Stat. 1161 .......... 17

Act of July 2, 1948, ch. 809, 62 Stat. 1224 .......... 17

Act of Oct. 5, 1949, ch. 604, 63 Stat. 705 .......... 17

Act of Aug. 15, 1953, Pub. L. No. 83-280, 67 Stat. 588 .......... 17, 18, 19

Act of Apr. 11, 1968, Pub. L. No. 90-284, 82 Stat. 73 ..........

Muscogee (Creek) Nation Const. art. VII .......... 22

Muscogee (Creek) Nation Code tit. 14 .......... 4, 22

Muscogee (Creek) Nation Code tit. 16 .......... 22

Muscogee (Creek) Nation Code tit. 27 .......... 23

Okla. Stat. tit. 11 .......... 3

Tulsa, Okla., Rev. Traffic Code § 655 .......... 3

U.S. Const. amend. X .......... 12

**Legislative Materials**

H.R. Conf. Rep. No. 101-938 (1990) .......... 10

H.R. Rep. No. 848 (1953) .......... 21

H.R. Rep. No. 102-61 (1991) .......... 10

**Other Authorities**

American Indian Law Deskbook § 4:16 (Conference of Western Attorneys General, 2023 ed.) .......... 19

Gavin Pendergraff, *Supreme Court Denies Hooper v. Tulsa Hearing Request*, KTUL News, updated Aug. 4, 2023, https://ktul.com/news/local/supreme-court-issues-stay-on-hooper-v-tulsa .......... 4

## INTRODUCTION

The Muscogee (Creek) Nation ("Nation") respectfully moves this Court for a preliminary injunction prohibiting the City of Tulsa and its Mayor, Chief of Police, and City Attorney (acting in their official capacities) (collectively "Tulsa") from asserting criminal jurisdiction over Indians within the boundaries of the Muscogee (Creek) Reservation. In *McGirt v. Oklahoma*, 140 S. Ct. 2452 (2020), the Supreme Court affirmed the continued existence of the Muscogee (Creek) Reservation. Pursuant to the United States Constitution and bedrock principles of federal Indian law, Oklahoma and its political subdivisions may exercise criminal jurisdiction over Indians within the Reservation only with the assent of Congress. "Nor has Congress ever passed a law conferring jurisdiction on Oklahoma." *Id.* at 2478.

Tulsa nevertheless has continued to prosecute Indians for conduct within the Creek Reservation and has made clear—both in court filings and in the media—that it intends to maintain this unlawful practice. One of Tulsa's asserted bases for its jurisdiction—Section 14 of the Curtis Act, an 1898 Indian Territory statute—has been conclusively rejected by the Tenth Circuit in a case to which Tulsa was a party. *See Hooper v. City of Tulsa*, 71 F.4th 1270 (10th Cir. 2023). Tulsa continues to rely on Section 14 in flagrant defiance of that decision.

Tulsa's other rationalization is equally infirm. Tulsa asserts that under *Oklahoma v. Castro-Huerta*, 142 S. Ct. 2486 (2022), Oklahoma (and by delegation Tulsa) enjoys criminal jurisdiction over Indians on the Creek Reservation concurrent with the Nation. But *Castro-Huerta* repeatedly disclaims any intent to address state criminal jurisdiction over Indians in Indian country. *See id*. at 2501 n.6 ("We express no view on state jurisdiction over a criminal case of that kind."); *id*. at 2504 n.9 ("To reiterate, we do not take a position on that question."). It instead confines its holding to state jurisdiction over non-Indians, which it upholds as a matter of

state power reserved by the Tenth Amendment. And settled precedent makes clear that the Tenth Amendment reserved to states no measure of criminal jurisdiction over Indians in Indian country.

The Nation accordingly has a strong likelihood of success on the merits of this action. Moreover, Tulsa's unlawful assertion of criminal jurisdiction over Indians within the Creek Reservation has irreparably harmed the Nation's sovereignty. Permitting Tulsa to continue exercising such jurisdiction during the pendency of this action would only compound that harm. Finally, the balance of the equities and the public interest tip decisively in favor of putting an end to Tulsa's unceasing violation of the law. A preliminary injunction should issue.

## BACKGROUND

### I. Allocation of Criminal Jurisdiction on the Creek Reservation

In *McGirt*, the Supreme Court affirmed that in treaties entered from 1832 to 1866, Congress established a federally protected Indian reservation for the Nation, 140 S. Ct. at 2460–62, and that since 1866, Congress has never disestablished the Reservation, such that it remains Indian country today under 18 U.S.C. § 1151(a), *id*. at 2462–68.

Accordingly, the settled rules governing state, tribal, and federal criminal jurisdiction that apply within Indian country generally, apply within the Creek Reservation. These include the cardinal principle that "a clear expression of the intention of Congress" is required before states may "try Indians for conduct on [Indian] lands." *Id*. at 2477 (quotation marks omitted); *see also, e.g.*, *Ute Indian Tribe of the Uintah and Ouray Reservation v. Utah*, 790 F.3d 1000, 1003 (10th Cir. 2015) ("[U]nless Congress provides an exception to the rule … states possess no authority to prosecute Indians for offenses in Indian country." (quotation marks omitted)). And as *McGirt* confirmed, "Oklahoma cannot come close" to establishing that Congress has authorized it to exercise criminal jurisdiction over Indians on the Creek Reservation. 140 S. Ct. at 2477.

## II. Tulsa's Continued Claims to Criminal Jurisdiction over Indians Within the Creek Reservation After *McGirt*

While Tulsa has claimed criminal jurisdiction over Indians on the Creek Reservation even after *McGirt*, it has in practice focused its prosecutions on Indian traffic offenses.

The Nation has in place sixty-nine cross-deputization agreements with the State of Oklahoma and various State agencies (including the State Highway Patrol), Oklahoma counties and municipalities (including both the County and City of Tulsa), and federal agencies. Decl. of Att'y Gen. Geraldine Wisner (Wisner Decl.) ¶ 11. Under these agreements, all cross-deputized officers, tribal and non-tribal, possess arrest authority within the Creek Reservation over all persons within their respective jurisdictions, Indian and non-Indian alike. *Id.* ¶ 12. This encompasses arrest authority for applicable tribal law and non-tribal law offenses, including state and municipal offenses, and specifically including traffic offenses. *Id.* ¶¶ 12, 18. If an arrest or stop is made by an officer of a jurisdiction without ultimate prosecutorial authority, the case is then referred to the jurisdiction possessing that authority. *Id.* ¶¶ 12–15.

After *McGirt*, and consistent with it, Tulsa began referring most felony and misdemeanor criminal offenses by Indians within the Creek Reservation to the Creek Nation for prosecution. *Id.* ¶ 21. For example, from January 1, 2023, to October 31, 2023, the Creek Nation received over 2,618 such referrals from the Tulsa Police Department. *Id.* ¶ 21(a). Tulsa, however, has declined to refer traffic offenses and has instead persisted in prosecuting them itself. *Id.* ¶¶ 22.[1]

[1] Violations of Tulsa's traffic laws are criminal offenses. *See* Tulsa, Okla., Rev. Traffic Code § 655 (unless incarceration or higher fine is imposed by the code, a person found in "violation of any provision of this chapter shall be guilty of an offense and, upon conviction, shall be punished by a fine of not more than Five Hundred Dollars"); *City of Elk City v. Taylor*, 157 P.3d 1152, 1154 (Okla. Crim. App. 2007) ("The prosecution in a municipal court for the violation of a city ordinance is a criminal matter as a finding of guilt carries with it criminal penalties, *i.e.*, incarceration or fines or both." (citing Okla. Stat. tit. 11, §§ 27–103 and 28–102)); *Hooper*, 71

**III. The Tenth Circuit's Decision in *Hooper v. City of Tulsa***

*Hooper* involved an Indian traffic offense within the Creek Reservation. Tulsa asserted jurisdiction to prosecute the offense under Section 14 of the Curtis Act, ch. 517, § 14, 30 Stat. 495, 499, an 1898 Indian Territory statute that conferred jurisdiction on federal territorial municipalities over their Indian and non-Indian inhabitants. The Tenth Circuit rejected Tulsa's argument, concluding that "by its plain text, Section 14 of the Curtis Act no longer applies to Tulsa," 71 F.4th at 1288, as Tulsa long ago ceased to be a federal instrumentality.

Tulsa requested that the Circuit stay its mandate pending the Supreme Court's resolution of the City's anticipated petition for a writ of certiorari. The Circuit declined. Order (July 19, 2023), *Hooper* (No. 22-5034). Tulsa then sought an emergency stay of the Circuit's mandate in the Supreme Court, which rejected the request on August 4, 2023. On Application for Stay (Aug. 4, 2023), *Hooper* (No. 22-5034). The Circuit's mandate issued that day. Mandate (Aug. 4, 2023), *Hooper* (No. 22-5034). Tulsa thereafter did not petition for certiorari review.

**IV. Tulsa's Continued Claim to Criminal Jurisdiction over Indians Within the Creek Reservation After *Hooper***

Tulsa has nevertheless continued to assert jurisdiction over Indians within the Creek Reservation. The day the mandate issued in *Hooper*, Tulsa stated in the press that it would "continue to enforce City ordinances against all persons within the City of Tulsa regardless of Indian status." Gavin Pendergraff, *Supreme Court Denies Hooper v. Tulsa Hearing Request*, KTUL News, updated Aug. 4, 2023 (quoting statement of Tulsa).[2] And it has in fact continued to

---

F.4th at 1272, 1274 (stating that Hooper's traffic violation involved "criminal conduct by an Indian in Indian country"). Traffic violations are likewise codified as criminal offenses under the Nation's criminal code. *See* NCA 20-087 (codified at MCN Code. tit. 14, ch. 3), http://www.creeksupremecourt.com/wp-content/uploads/NCA-20-087.pdf.

[2] https://ktul.com/news/local/supreme-court-issues-stay-on-hooper-v-tulsa.

prosecute rather than to refer traffic offenses. Wisner Decl. ¶ 22. A week after *Hooper*, for example, Tulsa asserted, in a Municipal Criminal Court prosecution for a traffic violation, that it "has jurisdiction over Indians for their violations that occur within City limits." City's Resp. to Def.'s Second Mot. to Dismiss at 6, *City of Tulsa v. O'Brien*, Case Nos. 720766–720766D (Mun. Criminal Ct. of Tulsa Aug. 11, 2023). In support of this assertion, Tulsa cited Section 14 of the Curtis Act, *id*. at 22–28, and *Castro-Huerta*, *id*. at 5–9.

The municipal court rejected both arguments. As to Tulsa's Section 14 claim, the court stated that the Tenth Circuit "has ruled to the contrary…. [T]his Court must follow the law that is in place at this time." Order Granting Def.'s Second Mot. to Dismiss at 4, *City of Tulsa v. O'Brien*, Case Nos. 720766–720766D (Mun. Criminal Ct. of Tulsa Aug. 17, 2023) (Ex. 1). And the court rejected Tulsa's *Castro-Huerta* argument because that decision "is specifically limited to concurrent jurisdiction to prosecute crimes committed by non-Indians against Indians in Indian country. No mention is made as to concurrent jurisdiction when the defendant is Indian." *Id*. at 3.

Tulsa has appealed the *O'Brien* decision to the Oklahoma Court of Criminal Appeals ("OCCA"). Pet. in Error, *City of Tulsa v. O'Brien*, Case No. S-2023-715 (Okla. Crim. App. Oct. 3, 2023).[3] Tulsa has also declared in a separate OCCA case that "[t]he City continues to assert jurisdiction over Indian offenses, and Indians continue to file motions to dismiss those cases." Tulsa's Mot. for Suppl. Briefing at 4, *Stitt v. City of Tulsa*, No. M-2022-984 (Okla. Crim. App. Aug. 18, 2023).[4] On October 19, 2023, Tulsa filed a supplemental brief in *Stitt* again claiming

[3] https://www.oscn.net/dockets/GetCaseInformation.aspx?db=appellate&number=S-2023-715&cmid=136030.

[4] https://www.oscn.net/dockets/GetCaseInformation.aspx?db=appellate&number=M-2022-984&cmid=134050.

that it enjoys jurisdiction under both the Curtis Act and *Castro-Huerta*. *See* Tulsa's Suppl. Briefing at 1, 6, *Stitt v. City of Tulsa*, Case No. M-2022-984 (Okla. Crim. App. Oct. 19, 2023).[5]

**ARGUMENT**

**I. The Nation Has Standing To Bring This Action.**

Standing requires "(1) … an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Baker v. USD 229 Blue Valley*, 979 F.3d 866, 871 (10th Cir. 2020) (citation omitted). These elements are easily satisfied here. Tulsa has evidenced its intent, through continued prosecutions and media statements, to persist in prosecuting Indians on the Creek Reservation. The Tenth Circuit has repeatedly found such conduct by non-tribal governments to constitute an unlawful interference with tribal self-government. *Supra* Section II.C. A decision in the Nation's favor would put an end to that interference. These circumstances establish Article III standing. *See, e.g.*, *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1242 (10th Cir. 2001).

**II. The Nation Amply Satisfies the Four-Factor Preliminary Injunction Test.**

**A. Preliminary Injunction Standard**

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Denver Homeless Out Loud v. Denver*, 32 F.4th 1259, 1277 (10th Cir. 2022) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Each of these factors weighs strongly in favor of preliminary injunctive relief.

[5] *Id.*

**B. The Nation Is Likely To Succeed on the Merits.**

Both of Tulsa's claims to continued jurisdiction over Indians within the Creek Reservation run headlong into settled law.

**1. The Nation Has a Substantial Likelihood of Success on Tulsa's Curtis Act Claim.**

Tulsa's claim to jurisdiction under the Curtis Act is foreclosed as a matter of law. The Tenth Circuit did not mince words. *See, e.g.*, *Hooper*, 71 F.4th at 1285 ("Section 14 no longer grants jurisdiction to Tulsa."); *id*. ("Because Tulsa is no longer authorized and organized according to chapter twenty-nine of Mansfield's Digest, Tulsa is no longer entitled to Congress's limited grant of jurisdiction in Section 14."); *id*. at 1288 ("[B]y its plain text, Section 14 of the Curtis Act no longer applies to Tulsa[.]"). *Hooper*, of course, binds this court. *United States v. Spedalieri*, 910 F.2d 707, 709 n.2 (10th Cir. 1990) ("A district court must follow the precedent of this circuit[.]"); *United States v. Williams*, Case No. 23-CR-00230-GKF, 2023 WL 6221770, at *5 (N.D. Okla. Sept. 25, 2023) (published decisions of Tenth Circuit are "binding on this court").

*Hooper* also binds Tulsa. The doctrine of collateral estoppel "bars a party from relitigating an issue once it has suffered an adverse determination on the issue, even if the issue arises when the party is pursuing or defending against a different claim." *Park Lake Res. Ltd. Liab. v. U.S. Dep't of Agric.*, 378 F.3d 1132, 1136 (10th Cir. 2004). The bar applies

> if the issue is (1) identical to an issue actually litigated and necessarily adjudicated in the prior proceeding; (2) The party against whom estoppel was sought was a party to or was in privity with a party to the prior proceeding; (3) There was a final judgment on the merits in the prior proceeding; and (4) The party against whom the doctrine is asserted had a full and fair opportunity to litigate the issues in the prior proceeding.

*Boulter v. Noble Energy Inc.*, 74 F.4th 1285, 1289 (10th Cir. 2023). These elements are satisfied here in textbook fashion. Tulsa was a party to *Hooper*. It asserted its Section 14 argument in full-throated fashion (Section 14 was indeed the central focus of the case). The Tenth Circuit rejected

Tulsa's position decisively on the merits, and both the Circuit and the Supreme Court declined to stay the Tenth Circuit mandate. Tulsa opted of its own accord not to petition the Supreme Court for a writ of certiorari. Tulsa, in other words, fully litigated the Section 14 issue, lost, and rather than respecting that outcome, seeks to relitigate it. This it cannot do.

As a matter of respect both for precedent and for the finality of judgments, then, the Nation has a clear likelihood of success on its claim that Tulsa's effort to cloak itself in Section 14's grant of authority to federal territorial instrumentalities lacks legal basis.

**2. The Nation Has a Substantial Likelihood of Success on the Merits of Tulsa's Claim to Jurisdiction Under *Castro-Huerta*.**

Tulsa's governmental powers are "derived *solely*" from the State of Oklahoma. *See Dear v. Nair*, No. 21-2124, 2022 WL 2165927, at *2 (10th Cir. June 16, 2022) (citation omitted); *see also Toch, LLC v. City of Tulsa*, 474 P.3d 859, 866 (Okla. 2020) (same). This includes its powers of criminal prosecution. *See Puerto Rico v. Sanchez Valle*, 579 U.S. 59, 75 (2016) ("the State is the furthest-back source of prosecutorial power" for charter municipalities). Thus, if *Castro-Huerta* does not support Oklahoma's jurisdiction, it cannot support Tulsa's—and that is the case.

**a. *Castro-Huerta* Does Not Disturb the Longstanding Rule that States Lack Criminal Jurisdiction over Indians in Indian Country Absent Congressional Assent.**

When the Court issued its decision in *Castro-Huerta*, the law was clear that state criminal jurisdiction over Indians in Indian country is per se foreclosed absent express authorization by Congress. As *McGirt*, drawing on long-settled precedent, had recently reaffirmed: "State courts generally have no jurisdiction to try Indians for conduct committed in Indian country," 140 S. Ct. at 2459 (quotation marks omitted), and "'a clear expression of the intention of Congress'" is required before states "may try Indians for conduct on their lands," *id.* at 2477 (quoting *Ex parte Crow Dog*, 109 U.S. 556, 572 (1883)). Accordingly, "when Congress has wished" states to have

that authority, "it has expressly granted them the jurisdiction[.]" *Williams v. Lee*, 358 U.S. 217, 221 (1959); *see also, e.g.*, *Hagen v. Utah*, 510 U.S. 399, 401–02, 408 (1994) ("Congress has not granted criminal jurisdiction to … Utah to try crimes committed by Indians in Indian country," and therefore, only if the locus of the crime "is not in Indian country" did Utah "properly exercise[] criminal jurisdiction over petitioner, an Indian[.]" (quotation marks omitted)); *Ute Indian Tribe*, 790 F.3d at 1004 ("unless Congress provides an exception to the rule … states possess 'no authority' to prosecute Indians for offenses in Indian country" (quoting *Cheyenne-Arapaho Tribes of Okla. v. Oklahoma*, 618 F.2d 665, 668 (10th Cir. 1980))); *United States v. Sands*, 968 F.2d 1058, 1061–63 (10th Cir. 1992) (finding Oklahoma had no criminal jurisdiction over Indian in Indian country because it lacked congressional authorization); *Ross v. Neff*, 905 F.2d 1349, 1352, 1353 (10th Cir. 1990) (finding no state criminal jurisdiction over Indian in Indian country because "Oklahoma has neither received by express grant nor acted pursuant to congressional authorization to assume criminal jurisdiction over this Indian country" and stating that such jurisdiction "must come from" Congress).

The per se prohibition against unauthorized state criminal jurisdiction over Indians in Indian country applies regardless of a defendant's tribal affiliation. *McGirt* applied it in a matter involving "an enrolled member of the Seminole Nation … [whose] crimes took place on the Creek Reservation." 140 S. Ct. at 2459. *Hagen* did the same with respect to a crime allegedly committed within the Ute Reservation by "an enrolled member of the Little Shell Band of Chippewa Indians of Montana," Pet'r's Brief at 4, *Hagen* (No. 92-6281), 1993 WL 384821, at *4. And when the Supreme Court held in *Duro v. Reina*, 495 U.S. 676 (1990), that tribes lack criminal jurisdiction over non-member Indians, Congress promptly enacted the "*Duro* fix,"

reaffirming that tribes possess that jurisdiction as a matter of their inherent authority, *see* 25 U.S.C. § 1301(2). Congress acted swiftly because it understood that

> *states do not have jurisdiction to try Indians for criminal offenses committed within Indian reservations except in those few instances in which Congress has conferred such authority upon them*. Thus, *Duro*'s holding that tribes lack criminal jurisdiction over non-member Indians has created a void in the preservation of law and order on many reservations.

H.R. Rep. No. 102-61, at 3–4 (1991) (emphasis added); *see also* H.R. Conf. Rep. No. 101-938, at 104 (1990) ("[U]nless the Congress acts to fill this jurisdictional void, [non-member Indians] may come onto an Indian reservation, commit a criminal misdemeanor, and know that there is *no governmental entity that has the jurisdiction to prosecute them* for their criminal acts. Such is the situation across Indian country since the Court's ruling[.]" (emphasis added)).

*Castro-Huerta*, which involved state jurisdiction over *non*-Indians in Indian country, did not disturb the long-settled precedents of the Supreme Court and the Tenth Circuit directly addressing state jurisdiction over Indians. Indeed, the Court repeatedly disclaimed any such intent. *See, e.g.*, 142 S. Ct. at 2495 n.2 (describing state jurisdiction "over crimes committed by Indians in Indian country" as "a question not before us"); *id.* at 2501 n.6 ("We express no view on state jurisdiction over a criminal case of that kind."); *id.* at 2500 (referring to "non-Indian on Indian crimes" as "the narrow jurisdictional issue in this case").

Tulsa has nevertheless contended that *Castro-Huerta*'s recognition of presumptive state criminal jurisdiction over non-Indians in Indian country logically extends to Indians. *See* City's Resp. to Second Mot. to Dismiss at 5–9, *City of Tulsa v. O'Brien*, Case Nos. 720766–720766D (Municipal Criminal Ct. of Tulsa Aug. 11, 2023). As demonstrated below, this assertion fundamentally misapprehends *Castro-Huerta* and its constitutional underpinnings. But as a threshold matter, Tulsa's argument is not cognizable in this Court. In Tulsa's view, *Castro-*

*Huerta* implicitly upended more than a century of Supreme Court and Tenth Circuit precedent foreclosing state jurisdiction over Indians in Indian country absent congressional assent. But the Supreme Court has stated repeatedly that "[o]ur decisions remain binding precedent until we see fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality." *Bosse v. Oklahoma*, 580 U.S. 1, 3 (2016) (citation omitted); *see also, e.g.*, *Thurston Motor Lines, Inc. v. Jordan K. Rand, Ltd.*, 460 U.S. 533, 535 (1983) ("[O]nly this Court may overrule one of its precedents. Until that occurs, [prior precedent] is the law[.]").

The Court has accordingly rejected the notion that lower courts may "conclude our more recent cases have, by implication, overruled an earlier precedent." *Agostini v. Felton*, 521 U.S. 203, 237 (1997). Indeed, it has admonished that

> [i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.

*Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989); *see also Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023) (stating that lower court "clearly erred" in finding that Court decision "implicitly overruled" prior precedent, and that lower courts may not do so "even if the lower court thinks the [prior] precedent is in tension with" later precedent (citation omitted)); *United States v. Maloid*, 71 F.4th 795, 808 (10th Cir. 2023) (lower courts must "apply Supreme Court cases that directly control. Only the Supreme Court can overrule its own precedents"); *Little v. Budd Co., Inc.*, 955 F.3d 816, 824 (10th Cir. 2020) (same). Under the same principle, district courts may not find that a Supreme Court decision has implicitly overruled Tenth Circuit precedent. *See Strain v. Regalado*, 977 F.3d 984, 993 (10th Cir. 2020).

Tulsa's suggestion that *Castro-Huerta* implicitly overrules prior Supreme Court and Tenth Circuit precedent governing state criminal jurisdiction over Indians for Indian country conduct accordingly should meet with rejection in this Court. Those precedents remain binding.

**b. States Retain No Criminal Jurisdiction over Indians Under the Tenth Amendment.**

Even if Tulsa's *Castro-Huerta* argument is cognizable, it fails on the merits. The per se rule is grounded firmly in the Constitution and fully comports with *Castro-Huerta*'s reasoning.

*Castro-Huerta* holds that states have jurisdiction concurrent with the federal government to prosecute non-Indians for crimes committed against Indians in Indian country absent federal preemption. 142 S. Ct. at 2504. The Court based this conclusion on the Tenth Amendment:

> [T]he Constitution allows a State to exercise jurisdiction in Indian country…. [A]s a matter of state sovereignty, a State has jurisdiction over all of its territory, including Indian country. See U.S. Const., Amdt. 10. As this Court has phrased it, a State is generally "entitled to the sovereignty and jurisdiction over all the territory within her limits." *Lessee of Pollard v. Hagan*, 3 How. 212, 228, 11 L. Ed. 565 (1845).

*Id*. at 2493. Accordingly,

> under the Constitution and this Court's precedents, the default is that States may exercise criminal jurisdiction within their territory[, s]ee Amdt. 10 [,]… unless that jurisdiction is *preempted*.

*Id*. at 2503.

Notably, the Court did not extend its Tenth Amendment reasoning to state jurisdiction over Indians within Indian country. Nor could it have done so consistent with the Amendment, which states: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. Under *Castro-Huerta*, criminal authority over non-Indians in Indian country was not delegated exclusively to the United States by the Constitution; nor was such authority prohibited

by it to the States. A measure of that jurisdiction was accordingly reserved to the States by the Tenth Amendment, such that states enjoy "concurrent jurisdiction with the Federal Government to prosecute crimes committed by non-Indians against Indians in Indian country." *Castro-Huerta*, 142 S. Ct. at 2492–93; *accord United States v. McBratney*, 104 U.S. 621, 624 (1881) (upon statehood a state "acquire[s] criminal jurisdiction over its own citizens and *other* white persons throughout the whole of the territory within its limits" (emphasis added)).

But this reasoning does not apply to jurisdiction over crimes by *Indians*, as two central, undeniable propositions establish. First, as the Supreme Court underscored just this past Term: "In a long line of cases, we have characterized Congress's power to legislate with respect to the Indian tribes as 'plenary and exclusive.'" *Haaland v. Brackeen*, 599 U.S. 255, 272 (2023) (collecting cases). That exclusive "power to legislate with respect to Indians …. includ[es] criminal law," *id*. at 275, extends to "Indians as individuals," *id*. at 278, and derives squarely from the Constitution, *see id.* at 273–74 (locating the grant of exclusive federal "authority to regulate Indians" in various constitutional provisions); *accord United States v. Lara*, 541 U.S. 193, 200 (2004) ("the Constitution grants Congress broad general powers to legislate in respect to Indian tribes" that are "plenary and exclusive" (citation omitted)). In sum, the Constitution placed Indians in Indian country "under the exclusive control of the Federal Government," *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 62, 72 (1996).

Second, the Tenth Amendment reserves to states only "that residuum of sovereignty not delegated to the United States by the Constitution." *Skiriotes v. Florida*, 313 U.S. 69, 77 (1941).[6]

[6] Oklahoma agrees. *See* Br. for Pet'r at 16, *Castro-Huerta* (No. 21-429), 2022 WL 628282, at *16 (stating that states retain "that residuum of sovereignty not delegated to the United States by the Constitution itself" (quoting *Skiriotes*, 313 U.S. at 77)).

Accordingly, where the Constitution grants a power *exclusively* to Congress, no "residuum" of state authority remains because states retain sovereignty under the Tenth Amendment "*only to the extent* that the Constitution has not … transferred those powers to the Federal Government." *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 549 (1985) (emphasis added). In other words, where "Congress … has under the Constitution exclusive authority" over a matter, it falls outside of "the powers 'reserved to the states' under the Tenth Amendment." *Maricopa Cty. v. Valley Nat'l Bank of Phoenix*, 318 U.S. 357, 361 (1943).

This has been well understood since the Founding. Chief Justice Marshall explained that when the Constitution grants a power to be "exercised exclusively by congress, the subject is … completely taken from the state[s] … as if they had been expressly forbidden to act on it," and no "concurrent power" is retained by the states. *Sturges v. Crowninshield*, 17 U.S. (4 Wheat.) 122, 193 (1819) (Marshall, C. J.). And it has remained the understanding ever since. *See, e.g.*, *United States v. Comstock*, 560 U.S. 126, 144 (2010) ("Virtually by definition, these powers [delegated to Congress by the Constitution] are not powers that the Constitution 'reserved to the States'"); *United States v. Pink*, 315 U.S. 203, 233 (1942) (stating that a power "vested in the national government exclusively" is "not shared by the States"); *Ute Indian Tribe of the Uintah and Ouray Reservation v. Lawrence*, 22 F.4th 892, 899–900 (10th Cir. 2022) ("the federal government's plenary and exclusive constitutional authority to legislate in respect to Indian tribes … leav[es] Indians free from state jurisdiction and control." (quotation marks omitted)), *cert. denied*, 143 S. Ct. 273 (2022); *see also Torres v. Tex. Dep't of Pub. Safety*, 142 S. Ct. 2455, 2476 (2022) (Thomas, J., dissenting, joined by Alito, J., Gorsuch, J., and Barrett, J.) ("Our precedents teach that whenever a power is 'exercised exclusively by Congress, the subject is as completely

taken from the State Legislatures, *as if they had been expressly forbidden to act on it*.'" (quoting *Sturges*, 17 U.S. (4 Wheat.) at 193)).[7]

Indeed, while *Castro-Huerta* quotes *Pollard v. Hagan*, 44 U.S. 212, 228 (1845), for the proposition that "a State is generally 'entitled to the sovereignty and jurisdiction over all the territory within her limits,'" 142 S. Ct. at 2493, *Pollard* is clear that those "rights of sovereignty and jurisdiction" are "*subject to the rights surrendered by the Constitution to the United States*," *Pollard*, 44 U.S. at 229 (emphasis added). *Castro-Huerta*, then, stands simply for the proposition that the Constitution did not delegate to the United States *exclusive* authority to regulate the conduct of non-Indians in Indian country, leaving a measure of that authority to the States under the Tenth Amendment. And its concomitant holding that "unless preempted, States have jurisdiction over crimes committed in Indian country," 142 S. Ct. at 2494, defeats rather than supports Tulsa's claim here because state criminal jurisdiction over Indians is preempted by the Constitution's delegation of exclusive authority to Congress. *See Kansas v. Garcia*, 140 S. Ct. 791, 801 (2020) (preemption may arise "from … *the Constitution itself*" (emphasis added) (citing *P.R. Dep't of Consumer Affairs v. Isla Petroleum Corp.*, 485 U.S. 495, 503 (1988)).[8]

**c. Opposite Presumptions Govern Authority over Indians and Non-Indians in Indian Country.**

The Constitution's delegation of exclusive criminal authority over Indians to Congress is the foundation of the per se rule that "State courts generally have no jurisdiction to try Indians

[7] The *Torres* majority did not dispute this principle; it focused on other issues to resolve the case.

[8] Notably, while the Constitution's grant of plenary and exclusive authority over Indians to the United States left no residual power to the states under the Tenth Amendment, it did leave residual sovereignty to the tribes in its pre-constitutional form, subject to Congress's subsequent assertions of authority. "[U]nless and 'until Congress acts, the tribes retain' their historic sovereign authority." *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 788 (2014) (quoting *United States v. Wheeler*, 435 U.S. 313, 323 (1978), *superseded by statute as stated in Lara*, 541 U.S. 193); *see also MacArthur v. San Juan Cty.*, 497 F.3d 1057, 1068 (10th Cir. 2007) (same).

for conduct committed in Indian country" absent "a clear expression of the intention of Congress," *McGirt*, 140 S. Ct. at 2459, 2477 (quotation marks omitted). As that rule recognizes, "Congress can authorize the States to exercise—as *their own*—inherent powers that the Constitution has otherwise placed off limits[.]" *Lara*, 541 U.S. at 211 (Stevens, J., concurring); *accord Prudential Ins. Co. v. Benjamin*, 328 U.S. 408, 430 (1946) (Congress may allow states to legislate in matters where Congress's authority is exclusive "by declaring expressly and affirmatively" that the matter "shall be subject to the laws of the several states" (quotation marks omitted)). But the presumptions that govern when Congress has granted states authority over Indians are different from those that apply when a state asserts jurisdiction over non-Indians.

The Supreme Court has long distinguished between matters that "come under state control in the absence of congressional regulation" and those that are "free from state control until Congress has acted[.]" *James Clark Distilling Co. v. W. Md. Ry. Co.*, 242 U.S. 311, 330 (1917). Under *Castro-Huerta*, state jurisdiction over non-Indians falls in the former category—states do not need the express assent of Congress because that power is reserved to them under the Tenth Amendment. That is, "States do not need a permission slip from Congress to exercise their sovereign authority" over non-Indians in Indian country. *Castro-Huerta*, 142 S. Ct. at 2503.

By contrast, state criminal jurisdiction over Indians falls in the latter category. Because the Constitution grants Congress criminal authority over Indians exclusive of the states, "the states cannot exercise that power without the assent of Congress." *James Clark Distilling*, 242 U.S. at 329 (citation omitted). *See McGirt*, 140 S. Ct. at 2477; *Williams*, 358 U.S. at 221; *Ute Indian Tribe*, 790 F.3d at 1003–04. States, therefore, *do* need a permission slip from Congress, and there is nothing demeaning about this conclusion. It simply reflects respect for the Constitution's allocation of authority.

**d. Congress Has Acted Repeatedly on the Understanding that States Presumptively Lack Criminal Jurisdiction over Indians in Indian Country.**

Congress has enacted a series of statutes over many decades to convey to states criminal jurisdiction over Indians in Indian country, because, consistent with the constitutional allocation of authority detailed above, both Congress and the states have understood such jurisdiction to otherwise be lacking. These statutes, each the product of "comprehensive and detailed congressional scrutiny" of Indian country jurisdictional issues, *Kennerly v. Dist. Court of Ninth Jud. Dist. of Mont.*, 400 U.S. 423, 427 (1971), further belie Tulsa's claim that such jurisdiction exists as a matter of inherent state sovereignty.

**State-Specific Statutes.** The 1940 Kansas Act was "the first major grant of jurisdiction to a State over offenses involving Indians committed in Indian country[.]" *Negonsott v. Samuels*, 507 U.S. 99, 103 (1993). It provides that "[j]urisdiction is conferred on the State of Kansas over offenses committed by or against Indians on Indian reservations[.]" 18 U.S.C. § 3243. By 1949, Congress had enacted similar statutes conveying Indian country criminal jurisdiction over Indians to New York, Iowa, North Dakota, and California. *See* Act of July 2, 1948, ch. 809, 62 Stat. 1224; Act of June 30, 1948, ch. 759, 62 Stat. 1161; Act of May 31, 1948, ch. 279, 60 Stat. 229; Act of Oct. 5, 1949, ch. 604, 63 Stat. 705. The Supreme Court has described those statutes as "surrenders of authority to some States." *Washington v. Confederated Bands and Tribes of Yakima Indian Nation*, 439 U.S. 463, 471 n.8 (1979). That description, and the statutory language on which it is based, make no sense if states already possessed jurisdiction over Indians under the Tenth Amendment.

**Public Law 280.** In 1953, Congress enacted jurisdictional legislation applicable to all states. *See* Act of Aug. 15, 1953, Pub. L. No. 83-280, 67 Stat. 588 ("P.L. 280"). The statute

transferred criminal jurisdiction within Indian country to five additional states, § 2, 67 Stat. at 588, and allowed other states to assume such jurisdiction under procedures set forth in the statute, § 6, 67 Stat. at 590. The Supreme Court has "enforced the procedural requirements and the jurisdictional provisions of Pub.L. 280 quite stringently, consistent with [its] understanding that the jurisdictional scheme embodied in that Act was the product of a wide-ranging and detailed congressional study." *Three Affiliated Tribes of Fort Berthold Reservation v. Wold Eng'g*, 476 U.S. 877, 887 (1986); *see also id.* at 886 (noting that P.L. 280 was a statutory "divestment of federal dominance" over Indian country jurisdiction); *Confederated Bands*, 439 U.S. at 471 n. 8 (stating that P.L. 280 was "an omnibus transfer" of jurisdiction and "surrender[] of authority" to states).

The text of P.L. 280 renders beyond doubt that it granted jurisdiction to states that they did not already possess. After conferring jurisdiction on the five listed states, § 2, 67 Stat. at 588, and allowing others to amend their constitutions and laws to assume such jurisdiction, § 6, *id.* at 590, the statute gave Congress's assent to "any other State *not having jurisdiction* with respect to criminal offenses … as provided for in this Act, *to assume jurisdiction … [by] affirmative legislative action*," § 7, *id.* at 590 (emphasis added). This requirement would be absurd if states already possessed such jurisdiction. As the Court has explained, "[n]or was the requirement of affirmative legislative action an idle choice of words," as it "was intended to assure that state jurisdiction would not be extended until [those states] manifested by political action their willingness and ability to discharge their new responsibilities." *Kennerly*, 400 U.S. at 427.

In 1968, Congress amended P.L. 280 to require tribal consent for any further assumption of jurisdiction by states and to allow states to retrocede jurisdiction previously assumed under the statute back to the United States. Act of Apr. 11, 1968, Pub. L. No. 90-284, §§ 403, 406, 82 Stat.

73, 79, 80. It would again have been absurd for Congress to provide for detailed procedures allowing states to retrocede jurisdiction they would nevertheless continue to possess, or requiring tribal consent to jurisdiction states could exercise regardless. *See, e.g.*, *McClanahan v. State Tax Comm'n*, 411 U.S. 164, 178 (1973) ("[W]e cannot believe that Congress would have required the consent of the Indians affected … if the States were free to accomplish the same goal unilaterally[.]"). And the amendments were far from nugatory. Since their passage, seven states have retroceded jurisdiction in whole or in part, and tribes have generally declined to consent to further extensions of state jurisdiction over Indians in their Indian country. American Indian Law Deskbook § 4:16 & n.26 (Conference of Western Attorneys General, May 2023 Update).

To be sure, P.L. 280 conferred state jurisdiction both "by *or against*" Indians. § 1, 67 Stat. at 588 (emphasis added). *Castro-Huerta* rejected the argument that the phrase "or against" (which encompasses crimes by non-Indians) would be "pointless surplusage" if states already possessed jurisdiction over non-Indians in Indian country. 142 S. Ct. at 2500. In doing so, the Court declared that "some surplusage … is not a silver bullet when interpreting statutes." *Id*. (quotation marks omitted).

However, ignoring the constitutional allocation of authority and holding that states had always possessed inherent jurisdiction not only over non-Indians in Indian country but also Indians would result in not merely "some" surplusage. It would render P.L. 280's detailed jurisdictional and procedural scheme (and that of the state-specific statutes that preceded it) superfluous *in their entirety*, including the detailed procedures Congress crafted to govern conferrals and retrocessions of jurisdiction—provisions that the Court has "enforced … quite stringently," *Wold*, 476 U.S. at 887. In *Parker Drilling Management Services, Ltd. v. Newton*, 139 S. Ct. 1881, 1889 (2019), the Court declined to interpret a jurisdictional statute in a manner

that "would render much of [the statute] unnecessary." Tulsa's position that states possess inherent jurisdiction over Indians in Indian country would deprive no fewer than six federal statutes "of any import," *id.* at 1890, and hence cannot stand.

*Castro-Huerta* again confirms the point. While noting that its holding might mean that P.L. 280's coverage of non-Indian defendants is redundant of existing law, *Castro-Huerta* emphasized that

> Public Law 280 encompasses far more than just non-Indian on Indian crimes (the issue here). Public Law 280 also grants States jurisdiction over crimes committed *by Indians*. So our resolution of the narrow jurisdictional issue in this case does not negate the significance of Public Law 280 in affording States broad criminal jurisdiction over other crimes committed in Indian country, such as crimes committed by Indians.

142 S. Ct. at 2500 (citations omitted). Indeed, the Supreme Court has long made clear that Congress's enactment of P.L. 280 rested on the lack of state jurisdiction over Indians in Indian country, and that crimes by Indians were Congress's principal focus in enacting the statute:

> The primary concern of Congress in enacting Pub.L. 280 … was with the problem of lawlessness on certain Indian reservations, and the absence of adequate tribal institutions for law enforcement. The House Report [accompanying P.L. 280] states:
>
>> "*These States lack jurisdiction to prosecute Indians* for most offenses committed on Indian reservations or other Indian country ….
>>
>> … In many States, tribes are not adequately organized to perform that function; consequently, there has been created a hiatus in law-enforcement authority that could best be remedied *by conferring criminal jurisdiction on States* indicating an ability and willingness to accept such responsibility."

*Bryan v. Itasca Cty.*, 426 U.S. 373, 379–80 (1976) (emphases added) (citation omitted) (quoting H.R. Rep. No. 848, at 5–6 (1953)).[9] No warrant exists for Tulsa's invitation to destroy the predicate for congressional action now.

**C. The Nation Will Suffer Irreparable Harm in the Absence of a Preliminary Injunction.**

Tulsa has demonstrated by word and deed that it will continue to prosecute Indians on the Creek Reservation for traffic offenses until the courts definitively tell it to stop. The Tenth Circuit has "repeatedly stated that … an invasion of tribal sovereignty can constitute irreparable injury," *Wyandotte Nation v. Sebelius*, 443 F.3d 1247, 1255 (10th Cir. 2006), and has found actions like those at issue here to represent the very sort of invasion warranting a preliminary injunction.

In *Ute Indian Tribe*, 790 F.3d 1000, for example, Utah and its political subdivisions were (as here) prosecuting Indians for traffic offenses within a tribe's Indian country. This was "itself an infringement on tribal sovereignty," *id*. at 1005, and it was compounded by the defendants' "disregard of [the Circuit's] decisions," *id.*, as demonstrated by their efforts to relitigate in the "friendlier forum" of state courts issues they had lost in the Tenth Circuit, *id*. at 1003 (quotation marks omitted). Under these circumstances, the Circuit concluded, "the harm to tribal sovereignty in this case is perhaps as serious as any to come our way in a long time." *Id*. at 1005.

This case is no different. Tulsa continues to prosecute Indians for traffic offenses within the Creek Reservation and continues to argue, in the state courts, that the Curtis Act provides it with a legal basis for doing so despite the Tenth Circuit's definitive rejection of that argument in

[9] In the same vein, Oklahoma acknowledged in *Castro-Huerta* that in enacting the state-specific predecessors to P.L. 280, "Congress was primarily focused on the lack of jurisdiction over crimes committed *by Indians* in Indian country." Br. for Pet'r at 30, *Castro-Huerta* (No. 21-429), 2022 WL 628282, at *30.

a case to which Tulsa was a party. *See* Tulsa Suppl. Br. at 1, *Stitt v. City of Tulsa*, (Okla. Ct. Crim. App. Oct. 19, 2023) ("The City has jurisdiction over Indian municipal offenders under the Curtis Act as the Tenth Circuit's *Hooper* decision was incorrectly decided."). Tulsa further seeks to justify such prosecutions based on a reading of *Castro-Huerta* that disregards the per se rule long adhered to by the Supreme Court and the Tenth Circuit. Under these circumstances, "there's just no room to debate whether the defendants' conduct 'create[s] the prospect of significant interference with [tribal] self-government' that this court has found sufficient to constitute 'irreparable injury.'" *Ute Indian Tribe*, 790 F.3d at 1006 (brackets in original) (quoting *Prairie Band*, 253 F.3d at 1250–51); *see also Wyandotte Nation*, 443 F.3d at 1251–52, 1255.

In *Prairie Band*, the Tenth Circuit likewise found a state's enforcement of its vehicle licensing and registration provisions against Indians to constitute irreparable injury to tribal sovereignty because the tribe had enacted its own licensing and registration provisions—which the Court described as a "traditional governmental function"—and thus "the threat of continued citation by the state [of owners of vehicles licensed and registered by the tribe] created the prospect of significant interference with [tribal] self-government.'" 253 F.3d at 1250 (brackets in original) (quotation marks omitted). Under these circumstances, "the injury to the tribe was 'certain and great' and more than 'merely serious or substantial.'" *Id*.

The Nation's sovereignty is no less impaired by Tulsa's actions here. The Nation has enacted its own criminal and traffic codes. It maintains tribal courts and a Lighthorse Police Department to enforce them against all Indians within its boundaries. Wisner Decl. ¶ 5; Decl. of Daniel Wind, III, Deputy Chief of Special Operations, Lighthorse Police Dep't ¶ 4; MCN Const. art. VII (Judicial Branch);[10] MCN Code tit. 14 (Crimes and Punishments), tit. 16 (Executive

[10] https://www.creeksupremecourt.com/mcn-constitution/.

Branch), and tit. 27 (Judicial Branch).[11] These are plainly core governmental functions, and Tulsa encroaches on them when its police and courts apply Tulsa's own criminal and traffic laws to those same Indians within the Reservation, declining to refer them to the Nation and instead subjecting them to a criminal justice system wholly independent of the Nation's own. Wisner Decl. ¶¶ 26–39. *Compare, e.g.*, *Fisher v. Dist. Court of Sixteenth Jud. Dist. of Mont.*, 424 U.S. 382, 387–88 (1976) ("State-court jurisdiction plainly would interfere with the powers of self-government" by subjecting Indians in Indian country "to a forum other than the one they have established for themselves."), *with Castro-Huerta*, 142 S. Ct. at 2501 (stating that state criminal jurisdiction over non-Indians in Indian country "would not deprive the tribe of any of its prosecutorial authority …. because … tribes [ordinarily] lack criminal jurisdiction to prosecute crimes committed by non-Indians" and because "a state prosecution of a non-Indian does not [as here] involve the exercise of state power over any Indian").

**D. The Balance of Harms and the Public Interest Strongly Favor Issuance of an Injunction.**

Where a case involves competing claims of jurisdiction, the Tenth Circuit has analyzed the balance of harms and public interest factors together. *See Ute Indian Tribe*, 790 F.3d at 1007. In assessing the highly analogous circumstances in *Ute Indian Tribe*, the Circuit declared that

> there's no question who has the better of it. On the Tribe's side of the ledger [is] … the "paramount federal policy" of ensuring that Indians do not suffer interference with their efforts to "develop ... strong self-government." *Seneca-Cayuga Tribe v. Oklahoma ex rel. Thompson*, 874 F.2d 709, 716 (10th Cir.1989); *see also Prairie Band*, 253 F.3d at 1253. Against this, the State and Wasatch County argue an injunction would impede their ability to ensure safety on public rights-of-way. But this concern "is not as portentous as [they] would have it." *Prairie Band*, 253 F.3d at 1253…. [N]othing in the requested temporary injunction would prevent the State and County from patrolling roads like the ones on which Ms. Jenkins was stopped, from stopping motorists suspected of traffic offenses to verify their tribal membership status, from ticketing and prosecuting

[11] https://www.creeksupremecourt.com/mcn-code/.

> non-Indians for offenses committed on those roads, from referring suspected offenses by Indians to tribal law enforcement, or from adjudicating disputes over the Indian status of accused traffic offenders when meaningful reasons exist to question that status. Instead, the temporary injunction would simply prohibit the State and County from prosecuting Ms. Jenkins and perhaps other tribal members for offenses in Indian country—something they have no legal entitlement to do in the first place. In this light, the defendants' claims to injury should an injunction issue shrink to all but "the vanishing point." *Seneca-Cayuga*, 874 F.2d at 716.

*Id*. (second ellipsis and second brackets in original).

The same reasoning applies with even greater force here. As described above, Tulsa's actions interfere with the Nation's exercise of its own governmental authority. And any law enforcement concerns Tulsa may invoke will surely not be as portentous as the City will assert. The Nation and Tulsa have in place a cross-deputization agreement that memorializes the very practices the Circuit concluded would allay public safety concerns. *See* Wisner Decl. ¶¶ 9–12, 18–19, 25 (describing in detail the operation of the cross-deputization agreement). Nothing prevents Tulsa from cooperating in that agreement with respect to traffic offenses, as other municipalities within the Creek Reservation are doing. *See, e.g.*, *id*. ¶¶ 23–24. Just between January 1, 2023, and October 31, 2023, the Nation received 1,083 traffic citation referrals from agencies, municipalities, and political subdivisions with which it has cross-deputization agreements. *Id.* ¶ 23. For example, the Nation received 281 traffic citations from the Broken Arrow Police Department, 170 traffic citations from the Coweta Police Department, and 156 traffic citations from the Oklahoma Highway Patrol during this period. *Id.* ¶ 23(a)–(c).

As the Nation's Attorney General explains, claims that Tulsa has made about the difficulties in honoring the cross-deputization agreements are not well-founded. Contrary to Tulsa's rhetoric, for example, officers need not exhaustively investigate Indian status or make conclusive determinations about it in the field. *Id.* ¶¶ 13–17, 18(a)–(d), 25(a)–(e). They can make a reasoned judgment, just as they do about numerous other issues as part of every traffic stop,

with the Nation and the City (and their court systems if necessary) able to further explore any questions of status and to reach final decisions later. *Id.* ¶ 18(a)–(d). Nor do officers have to make conclusive determinations regarding land status, *id.* ¶ 17, or to assess what violations of the Nation's Code an offender may have committed. Instead, officers can write citations based on their own jurisdiction's code, with the Nation's Attorney General's Office thereafter doing the requisite translation. *Id.*

Tulsa's purported concerns about the possibilities for cooperative law enforcement are further undermined by the highly selective nature of those claims. Tulsa honors its cross-deputization agreement with the Creek Nation with respect to the vast majority of criminal matters, including serious crimes that require significant resources to prosecute. From January 1, 2023, to October 31, 2023, alone, "the [Creek] Nation received a total of 2,618 criminal felony and criminal misdemeanor referrals from the City of Tulsa Police Department." *Id.* ¶ 21(a). But Tulsa selectively declines to refer municipal traffic offenses to the Nation, *see id*. ¶ 22, suggesting that considerations other than public safety may be at play.

**CONCLUSION**

The Nation respectfully requests that the Court preliminarily enjoin Tulsa from any further assertion of criminal jurisdiction over Indians within the Creek Reservation pending final resolution of this action.

Dated: November 15, 2023

Respectfully submitted,

/s/ Riyaz A. Kanji
Riyaz A. Kanji
David A. Giampetroni
KANJI & KATZEN, P.L.L.C.
P.O. Box 3971
Ann Arbor, MI 48106
(734) 769-5400
rkanji@kanjikatzen.com
dgiampetroni@kanjikatzen.com

Philip H. Tinker
KANJI & KATZEN, P.L.L.C.
811 1st Avenue, Suite 630
Seattle, WA 98104
(206) 344-8100
ptinker@kanjikatzen.com

Stephanie R. Rush, OBA No. 34017
KANJI & KATZEN, P.L.L.C.
P.O. Box 2579
Sapulpa, OK 74067
(206) 486-8211
vrush@kanjikatzen.com

Geraldine Wisner, OBA No. 20128
Attorney General
MUSCOGEE (CREEK) NATION
P.O. Box 580
Okmulgee, OK 74447
(918) 295-9720
gwisner@mcnag.com

O. Joseph Williams, OBA No. 19256
O. JOSEPH WILLIAMS LAW OFFICE, PLLC
The McCulloch Building
114 N. Grand Avenue, Suite 520
P.O. Box 1131
Okmulgee, OK 74447
(918) 752-0020
jwilliams@williamslaw-pllc.com

*Counsel for Muscogee (Creek) Nation*

**CERTIFICATE OF SERVICE**

I certify that on November 15, 2023, this document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

/s/ *Riyaz A. Kanji*
Riyaz A. Kanji