IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| MUSCOGEE (CREEK) NATION, a federally recognized Indian Tribe, <br><br> Plaintiff, <br><br> vs. <br><br> CITY OF TULSA; G.T. BYNUM, in his official capacity as Mayor of City of Tulsa; WENDELL FRANKLIN, in his official capacity as Chief of Police, Tulsa Police Department; and JACK BLAIR, in his official capacity as City Attorney for City of Tulsa, <br><br> Defendants. | Case No. 23-CV-490-JDR-SH |

**GOVERNOR J. KEVIN STITT'S COMBINED REPLY TO MUSCOGEE (CREEK) NATION'S COMBINED RESPONSE TO NOTICE OF REQUIRED DISMISSAL OR MOTION TO INTERVENE BY GOVERNOR J. KEVIN STITT AND DEFENDANTS' JOINT RESPONSE TO NOTICE OF REQUIRED DISMISSAL AND MOTION TO INTERVENE BY GOVERNOR J. KEVIN STITT**

In their responses and objections to the Governor's Notice of Required Dismissal or Motion to Intervene, the Parties provide no answer to the central legal defect of this case: the Tribe is challenging the State of Oklahoma's sovereign police powers while excluding the State itself as a party and participant. Instead, they recast the controversy as moot or functionally resolved by referencing a new "municipal policy" implemented through a proposed settlement agreement that will supposedly "resolve this lawsuit without addressing the underlying jurisdictional question." Doc. 150 at 1; *see also* Doc. 152 at 5 (suggesting the issue of the "state-derived concurrent jurisdiction to prosecute Indians for conduct arising within the Creek Reservation . . . is no longer a live dispute in this case."); Doc. 152 at 7 ("Once again, none of this reflects the present posture of this case."). The "present posture of this case," however, exists only if this Court lends its stamp of approval to that settlement agreement. Doc. 152 at 4; *see also id.* at 3 (asking for "[t]his Court's approval of the Agreement and entry of the Proposed Order").

1

The problem for the Parties is that the operation of Rules 19 and 24 turn on the *claims pled,* not by a party's subsequent abandonment of those claims through settlement. *See* Fed. R. Civ. P. 19 (requiring joinder if "the person claims an interest relating to the **subject of the action**."); Fed. R. Civ. P. 24(a)(2) (requiring courts to permit intervention to anyone who "claims an interest relating to the property or transaction that is the **subject of the action**") (emphases added). The Federal Rules do not permit litigants to sideline a necessary sovereign party simply by settling around it. If, as the Tribe now claims, the "Nation is no longer asking the Court to declare that the State and its subdivisions do not have concurrent jurisdiction to prosecute Indian defendants[,]" then it should have no objection to the dismissal of its Complaint—relief requested by both the City of Tulsa and the Governor. Doc. 150 at 2. But asking the Court to approve a settlement as a way to avoid litigating the jurisdictional issues does not, as a matter of law, eliminate their legal relevance under Rules 19 and 24. Unless and until the Complaint is unequivocally dismissed, "the jurisdictional dispute identified by the Governor as the basis for his claimed interest" remains at issue in this lawsuit. Doc. 152 at 4. Because the Complaint challenges state-derived municipal authority, and the proposed settlement would directly affect the exercise of that authority, the State remains a necessary and indispensable party to these proceedings.

The Parties' assertion that the State's interests will not be impaired by what they recast as Tulsa's "policy determination not to exercise . . . jurisdiction" is not credible. Doc. 152 at 4; *see id.* at 10 ("Neither the Agreement nor the Order binds the State or requires the Court to take a position on state or municipal criminal jurisdiction in Indian country."); *id.* at 13 ("the Governor asserts [intervention] interests that are at no risk of impairment by virtue of the parties' settlement."). Whether or not the agreement binds the State formally, approval by this Court will be used to justify immediate implementation of policies that intrude upon the State's sovereign police powers and its public safety responsibilities. The proposed settlement would reshape enforcement practices, redirect prosecutorial

discretion, and establish a new framework for how Tulsa processes criminal cases involving Indian defendants—all squarely within the State's sovereign domain. That the agreement is cast as a voluntary municipal policy does not negate its practical effects.

Worse still, if the State challenges that policy and cooperative agreement in collateral state court litigation as unconstitutional or unlawful under Oklahoma law, the Parties will tout any approval given by this Court as an insurmountable barrier to reversing such a "policy." No court approval is needed for the City of Tulsa to adopt municipal policies—lawful or otherwise. The fact the Parties seek this Court's blessing on that policy is telling. Doc. 152 at 11. Even more so is the implication that such approval will affirmatively "further the interests of the public and the courts . . . ." *Id.*[1]

The inconsistency in the Tribe's position is also notable. It concedes that "a multiplicity of state and federal cases in which assertions of criminal jurisdiction over Indians by the State and its subdivisions are being litigated" while at the same time suggesting that settlement here "will render moot all disputed issues between the parties . . . ." *Id.* at 17, 11. Both cannot be true. If similar cases are ongoing elsewhere, then the underlying controversy—and the contested "policy" embedded in the settlement agreement—will not be a moot matter going forward. Moreover, when the Tribe suggests this Court's approval will prevent "costly litigation in this Court and on appeal," *id.* at 11–12, it ignores the fact the State has yet to be heard. *See also id.* at 17 ("approval of the parties' settlement by this Court would result in a decrease in the number of suits raising the jurisdictional issue").

The Tribe's attempt to avoid *Castro-Huerta*'s holding by suggesting it was limited to the facts before it is likewise unavailing. *See id.* at 8–9. The Supreme Court could not have been clearer: "[t]he Court's precedents establish that Indian country is part of a State's territory and that, unless

---

[1] In other words, while the Tribe asserts this Court's approval will require "no findings of fact or conclusions of law regarding the merits of the parties' initial jurisdictional dispute[,]" Doc. 152 at 2, they will inevitably treat any such approval as signaling judicial endorsement. Rather than "eliminating all risk of inconsistency with other court judgments[,]" confusion will follow. *Id.* at 12.

3

preempted, States have jurisdiction over crimes committed in Indian country." Doc. 127 at 13 (quoting *Oklahoma v. Castro-Heurta,* 597 U.S. 629, 638 (2022)). *Unless* criminal jurisdiction is preempted, "the default is that States may exercise criminal jurisdiction within their territory. . . . States do not need a permission slip from Congress to exercise their sovereign authority." *Id.* at 653. This Court is not at liberty to disregard a 2022 Supreme Court decision in favor of a 2015 Tenth Circuit opinion. To the extent that *Ute Indian Tribe of the Uintah and Ouray Reservation v. Utah*, 790 F.3d 1000, 1004 (10th Cir. 2015) held that the default is that the "state possess[es] no authority to prosecute Indians for offenses in Indian country," that holding cannot be reconciled with *Castro-Huerta.* Doc. 152 at 8 (quoting *Ute Indian* Tribe, 790 F.3d at 1004). The Tribe's response also fails to identify any primary source of federal law that the City of Tulsa's exercise of criminal jurisdiction over non-major crimes would implicate, let alone violate. *Compare id.* at 6–9 *with* Doc. 127 at 9–14.

The Tribe's claim that it lacks an adequate remedy if the suit is dismissed only underscores the sovereign immunity issue. *Compare* Doc. 152 at 12 *with* Doc. 127 at 8–9. The absence of an alternative forum is a direct result of the legal bar imposed by the State's sovereign immunity. That is not a defect—it is the law working as intended. Just as happened in *McGirt* and *Castro-Huerta*, the Tribes will have the opportunity to assert their interests in procedurally proper cases. That is not a problem for this Court to solve. And the Tribe's own concession that "Oklahoma courts recognize Oklahoma's sovereign immunity to unconsented suits in its own courts on issues arising under federal law" should make this Court seriously reluctant to grant the relief requested by the Parties. Doc. 152 at 12. After all, the State's sovereign immunity is a legal bar to suit here too.

As for the Tribe's procedural objection under Federal Rule 24(c), any nominal defect can be immediately cured. Intervention was requested as an alternative form of relief, and the Governor's intent is to file a motion to dismiss incorporating arguments already raised. If the Court deems a formal pleading necessary, the Governor is prepared to file one immediately. As to timeliness, the

Tribe does not dispute that this case remains in its early stages. There is no scheduling order, no trial date, and no motion deadlines. *See Utah Ass'n of Ctys. v. Clinton*, 255 F.3d 1246, 1250 –51 (10th Cir. 2001); Doc. 127 at 21. And while the case was filed in November 2023, a fact the Tribe highlights at page 15, it does little to dispute that the State's concrete interest only arose once Tulsa began backing away from its defenses and pursuing settlement—an event occurring only months before the Governor's Notice and Motion. *Compare* Doc. 152 at 15 with Doc. 127 at 21.

What's more, the Tribe's only meaningful claim of prejudice is that permitting intervention would "blow up the parties' hard-won compromise and resurrect the jurisdiction disputes . . . ." *See* Doc. 152 at 16. But that result stems directly from the Parties' decision to exclude the State from the litigation while pursuing settlement—while being well aware the State was a necessary and indispensable party. That strategic choice created the prejudice underlying the present posture, and that posture is exactly why intervention is necessary if dismissal is not granted. The suggestion that the Governor's motion is untimely ignores that the prejudice they now cite is self-inflicted. The Governor's motion is timely.

Given the unresolved legal questions and the real consequences of the proposed resolution, dismissal remains the most appropriate remedy. If the Court concludes otherwise, the Governor's motion to intervene should be granted.

Respectfully submitted,

*/s/ Audrey A. Weaver*
BENJAMIN M. LEPAK, OBA No. 30886
  *General Counsel*
AUDREY A. WEAVER, OBA No. 33258
  *Deputy General Counsel*
REMINGTON D. DEAN, OBA No. 35581
  *Deputy General Counsel*
OFFICE OF GOVERNOR J. KEVIN STITT
2300 N. Lincoln Blvd., Suite 212
Oklahoma City, OK 73105
Phone: (405) 521-2342
Benjamin.lepak@gov.ok.gov
Audrey.weaver@gov.ok.gov
Remington.dean@gov.ok.gov
*Counsel for J. Kevin Stitt, Governor of Oklahoma*

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of July, 2025, I electronically transmitted the foregoing document to the Clerk of this Court using the ECF System for filing and transmittal and a Notice of Electronic Filing to counsel of record who are ECF registrants.

Respectfully submitted,

*/s/ Audrey A. Weaver*
Audrey Weaver
